Adam Wolek (*pro hac vice*)
Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2800
Chicago, IL 60601
Tel: 312.836.4063
Fax: 312.966.8598
awolek@taftlaw.com
*Attorney for Defendant Scott Carney*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| INTERNATIONAL MARKETS LIVE, INC., a New York corporation; CHRISTOPHER TERRY, an individual;<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT HALTERMAN, an individual; SCOTT CARNEY, an individual; ETHAN VANDERBUILT, an individual;<br><br>Defendants. | Case No: 2:18-cv-00187-JAD-GWF<br><br><br>**DEFENDANT SCOTT CARNEY'S MOTION FOR ATTORNEYS' FEES AND COSTS** |

Some plaintiffs attempt to use the court system as their hammer to silence critics through the scare of litigation. Such is the case here. Plaintiffs improperly filed this lawsuit to retaliate against Defendant Scott Carney for filing a whistleblower complaint with the U.S. Commodity Futures Trading Commission ("CFTC"), and to silence Mr. Carney's free speech and prevent Mr. Carney from further telling others that Plaintiff IML was being investigated by the CFTC for commodity violations. Indeed, Plaintiffs filed their lawsuit a month after Mr. Carney had 1) filed a whistleblower complaint against IML with the CFTC and 2) alluded to CFTC's investigation of IML on his own Facebook page. Plaintiffs' lawsuit against Mr. Carney was baseless from the very beginning as the CFTC *was* in fact investigating IML and determined that IML *had* violated federal law. Indeed, IML was ordered

1

by the CFTC to pay a $150,000 penalty. (*See* the CFTC's September 14, 2018 Order, attached hereto as "Exhibit A").

Despite Mr. Carney's statements being true, Plaintiffs nevertheless pursued their lawsuit and demanded that they would not dismiss their suit unless Mr. Carney stopped his (true) online postings. Plaintiffs knew their suit was meritless, yet still pursued it and attempted to use the court as a venue for their vendetta. In fact, Plaintiffs did not drop their suit even after they submitted a settlement to the CFTC, or after they were found to have violated the Commodity Exchange Act. Accordingly, Defendant Scott Carney ("Scott Carney" or "Mr. Carney") respectfully moves this Court for an order awarding him attorneys' fees and costs incurred in defending this meritless and vexatious lawsuit filed by Plaintiffs International Markets Live, Inc. ("IML") and Christopher Terry ("Christopher Terry" or "Terry") (collectively, "Plaintiffs"). This Motion is made and based upon the Court's inherent authority, NRS 18.010, Federal Rule 54, the pleadings and papers on file, the evidence filed contemporaneously herewith, the Memorandum of Points and Authorities stated herein, and any oral argument this Court wishes to entertain.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs' lawsuit never had any basis in fact or law. Plaintiffs knew all the relevant facts, issues, and law prior to initiating this lawsuit. Plaintiffs knew that Mr. Carney's statement that IML was under investigation was true because IML entered into an offer of settlement agreement with the CFTC, shortly after filing their lawsuit against Mr. Carney. (*See* Ex. A). Plaintiffs also knew that Mr. Carney did not post his Facebook statement while he was in Nevada. (*See* ECF No. 2). Moreover, Plaintiffs knew that Mr. Carney was a Florida resident and was wheelchair-bound. (ECF No. 2 at ¶ 5). Given this knowledge from the outset of this dispute, Plaintiffs knew that they had no legitimate,

good faith basis to bring an action against Mr. Carney. Nevertheless, Plaintiffs brought and maintained this lawsuit seeking over $1,000,000 in damages from Mr. Carney, therefore forcing Mr. Carney to needlessly incur $61,336.13 in attorneys' fees and costs defending this frivolous action.

Accordingly, this Court should assess an award of attorneys' fees and costs against Plaintiffs and in Defendant Carney's favor in the amount of $61,336.13.

## II.   STATEMENT OF RELEVANT FACTS

Plaintiff IML operates websites about commodity trading to paying customers, particularly information concerning trading in foreign currencies ("forex"). (*See* Ex. A). Plaintiff Christopher Terry is IML's CEO.

In January 2018, Defendant Scott Carney filed a whistleblower complaint with the CFTC concerning commodity related violations by Plaintiff IML. (ECF No. 30). That same month, Mr. Carney posted critical and opinionated statements on his own Facebook page, where he alluded to the fact that IML was under federal investigation by the CFTC. (ECF No. 30).

Plaintiffs filed a lawsuit on February 1, 2018 against Mr. Carney in retaliation to Mr. Carney filing his whistleblower complaint with the CFTC, and to retaliate for Mr. Carney's Facebook post concerning the CFTC's investigation of IML. In their initial complaint, Plaintiffs' alleged that Mr. Carney "filed a false Complaint with the Commodities Future Trading Commission on or about the beginning of January 2018." (ECF No. 2, ¶ 22). Plaintiffs further alleged that on or about January 19, 2018, Mr. Carney posted on his own Facebook page: "IML Federal Investigation in FULL SWING! That's all I cansay [sic]." (ECF No. 2, ¶ 23). Based on these general allegations, Plaintiffs sought $1,000,000 in damages against Mr. Carney under various theories of liability, including defamation per se, trade libel, tortious interference with

contractual relations, tortious interference with prospective economic advantage, and civil conspiracy, all based on Mr. Carney's online statements. (ECF No. 2).

On May 10, 2018, Mr. Carney filed a motion to dismiss Plaintiffs' initial complaint for lack of personal jurisdiction, improper venue, and failure to state a claim. (ECF No. 15). Mr. Carney's motion was based upon several arguments, including that Mr. Carney had no meaningful connection to Nevada because he did not own property or conduct any business in Nevada, and none of the conduct alleged by Plaintiffs occurred in Nevada. (ECF No. 15). Mr. Carney further asserted that his Facebook statements were not actionable because it was true that the CFTC was investigating Plaintiffs. (ECF No. 15).

Following Scott Carney's motion to dismiss, Plaintiffs amended their complaint by dropping their civil conspiracy claim, and adding social media posts that Mr. Carney had posted <u>after</u> Plaintiffs' lawsuit was filed, and thus could not be used to establish jurisdiction at the time Plaintiffs filed their lawsuit. (ECF No. 19 at ¶¶ 15-21).

On June 7, 2018, Mr. Carney filed a motion to dismiss Plaintiffs' First Amended Complaint (hereafter, "Complaint") for lack of personal jurisdiction and for failure to state a claim. (ECF No. 22). Again, Mr. Carney's motion was made and based upon several arguments, including that Carney had no meaningful connection to Nevada and because his statements were true and not actionable. (ECF No. 22).

After Mr. Carney moved to dismiss Plaintiffs' First Amended Complaint, the CFTC announced that Plaintiff IML was indeed under investigation and had violated the Commodity Exchange Act and CFTC Regulations. (*See* Ex. A). The CFTC also announced that IML was ordered to pay $150,000 as a monetary penalty for violating the Commodity Exchange Act and CFTC Regulations. (*See* Ex. A).

Even after the CFTC's action, Plaintiff failed to inform the Court of the CFTC's findings or their relevance to their case. Plaintiff also failed to dismiss the suit despite knowing that they could not succeed. Four months went by without a word from Plaintiffs, then this Court needlessly expended resources drafting its order dismissing all claims against Defendant Scott Carney due to lack of personal jurisdiction over Mr. Carney because, among other things, Mr. Carney was a resident of Florida and his Facebook post was made outside of Nevada and was not directed towards Nevada. (ECF No. 30). In addition to dismissing all claims against Mr. Carney, the Court gave Plaintiffs until February 18, 2019 to file a second amended complaint if Plaintiffs could state true facts to establish this Court's jurisdiction over Mr. Carney. (ECF No. 30). Despite this Court's allowance, Plaintiffs failed to refile and Defendant Carney now seeks an order awarding him attorneys' fees for having to defend against this action.

## III.   STATEMENT OF LAW

Under the traditional American rule, attorneys' fees are typically only awarded when authorized by statute or contract. However, the "common law allows a court to assess attorney's fees against a losing party that has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Rodriguez v. United States*, 542 F.3d 704, 709 (9th Cir. 2008) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)).

> Federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require. Indeed, the power to award such fees is part of the original authority of the chancellor to do equity in a particular situation, and federal courts do not hesitate to exercise this inherent equitable power whenever overriding considerations indicate the need for such a recovery. Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. In this class of cases, the underlying rationale of "fee shifting" is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of "bad faith" on the part of the unsuccessful litigant.

*See Hall v. Cole*, 412 U.S. 1, 4-5 (1973) (internal citations and quotations omitted).

5

"[A] finding of bad faith is warranted where an attorney 'knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Rodriguez*, 542 F.3d at 709 (quoting *Primus Auto. Fin. Servs. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997). An "award of attorney's fees is justified when reckless conduct is combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Ibrahim v. United States Dep't of Homeland Sec.*, 912 F.3d 1147, 1180-81 (9th Cir. 2019). "A frivolous case is one that is groundless . . . with little prospect of success; often brought to embarrass or annoy the defendant." *Rodriguez*, 542 F.3d 704 at 709.

The Court may also make an allowance of attorneys' fees to a prevailing party when the court finds that the claim was brought or maintained without reasonable ground or to harass the prevailing party. NRS 18.010(2)(b). "The court shall liberally construe [NRS 18.010(2)(b)] in favor of awarding attorney's fees in all appropriate situations" *Id.* " It is the intent of the Legislature that the court award attorney's fees pursuant to this paragraph…in all appropriate situations to punish for and deter frivolous or vexatious claims and defenses because such claims and defenses overburden limited judicial resources, hinder the timely resolution of meritorious claims and increase the costs of engaging in business and providing professional services to the public." *Id.*

## IV.    ARGUMENT

Plaintiffs knowingly, or at least recklessly, brought and maintained this action in bad faith and without reasonable grounds. Their conduct was frivolous, vexatious, and has needlessly cost Defendant Carney tens of thousands of dollars. Plaintiffs should therefore be ordered to pay Mr. Carney $61,336.13 as his attorneys' fees and costs in defending this frivolous action.

**A.     Plaintiffs' Lawsuit Was Filed In Bad Faith and Without Reasonable Grounds.**

       **1.     Plaintiffs' Lawsuit was Baseless as Carney had No Connection to Nevada or this District Court.**

As discussed above, Plaintiffs filed their defamation and tortious interference lawsuit against Scott Carney in retaliation to Mr. Carney filing a whistleblower complaint and in retaliation to Mr. Carney alluding to the CFTC's investigation of IML on Facebook. Plaintiffs have harassed and sued at least ten other individuals for defamation and tortious interference in the District of Nevada based on critical Facebook posts. *See Int'l Markets Live, Inc., et al. v. Halterman, et al.*, 2:18-cv-00187; *Int'l Markets Live, Inc., et al. v. Santiago, et al.*, 2:18-cv-01112-KJD-PAL. As is the case here, none of those individuals were Nevada residents. (ECF 26). Consequently, this Court should punish and deter Plaintiffs from using the Nevada federal court system as a mechanism for harassment by awarding Mr. Carney his attorneys' fees and costs as Plaintiffs' lawsuit was harassing, filed in bad faith, and without reasonable grounds because Plaintiffs' claims were without any basis in fact or law.

Plaintiffs knew that Mr. Carney lived in Florida, because they served Mr. Carney at his Miami, Florida residence. (*See* ECF No. 2 at ¶ 5; *see also* ECF No. 10). Also, IML's CEO, Chris Terry, knew that Mr. Carney lived in Miami and was wheelchair-bound because of their past relationship. Plaintiffs also knew that Mr. Carney did not post his Facebook statement while he was in Nevada, or that such posting constitutes a connection to Nevada. (*See* ECF No. 2). Accordingly, Plaintiffs' case had no prospect of success from the very beginning as no court in this district would have been able to assert jurisdiction over Mr. Carney because Mr. Carney had no relevant connection with the State of Nevada. Simply because *Plaintiff Christopher Terry* lived in Nevada, Plaintiffs filed and maintained their baseless lawsuit in this district, causing Mr. Carney to incur significant legal fees, while filing numerous motions outlining why the suit was improper.

Ultimately, this Court dismissed all claims against Mr. Carney because this Court lacked jurisdiction over him because, among other things, he lived and made his online posts in Florida. (ECF No. 30). Thus, neither Plaintiffs' initial or amended complaints contained any facts that would allow this Court to assert jurisdiction over Mr. Carney. Nevertheless, Plaintiffs chose to file and maintain this action even after Mr. Carney, via his motion to dismiss, had notified Plaintiffs that he had no contacts with Nevada. Because it was clear that no facts could establish Plaintiffs' jurisdictional claim, this Court can assume that Plaintiffs' case was filed in Nevada without cause, and in retaliation for the whistleblower action and online postings, in bad faith, and for the exclusive purpose of harassing Scott Carney. This opinion is further strengthened by the fact that Plaintiffs chose not to cure their jurisdictional defects when the Court gave them one final opportunity. Accordingly, this Court should "right Plaintiffs' wrong" by awarding Scott Carney his attorneys' fees for having to defend this baseless action.

### 2.      Plaintiffs' Claims Were Frivolous.

Even if this Court had asserted jurisdiction over Mr. Carney, an award of attorneys' fees would be appropriate as Plaintiffs' claims against Mr. Carney had no basis in fact or law and this lawsuit was therefore filed in bad faith and under unreasonable grounds. As explained above, Plaintiffs initially brought five claims against Mr. Carney: (1) defamation per se, (2) trade libel, (3) tortious interference with contractual relations, (4) tortious interference with prospective economic advantage, and (5) civil conspiracy. All five of these claims were premised on Plaintiffs' allegation that Mr. Carney had lied about IML being investigated by the CFTC. However, not only was IML investigated by the CFTC, it entered into an offer of settlement with the CFTC for violating the Commodity Exchange Act, and IML was therefore forced to pay a $150,000 penalty. Because IML was being investigated when Plaintiffs filed their initial lawsuit and amended

complaint, their claims had no chance of being successful and thus were frivolous and brought

without reasonable grounds, in bad faith, and for the sole purpose of harassment.

### a.    Plaintiffs' Defamation Claim Was Baseless.

Plaintiffs' defamation claim was baseless and had no basis in fact or law. Under Nevada

law, the elements of defamation are: "(1) a false and defamatory statement of fact by the defendant

concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to

at least negligence; and (4) actual or presumed damages." *Tsao v. Desert Palace, Inc.*, 698 F.3d

1128, 1148 (9th Cir. 2012) (quoting *Pope v. Motel 6*, 114 P.3d 277, 282 (Nev. 2005)). "Statements

of opinion are protected speech under the First Amendment of the United States Constitution[,] . .

. are not actionable at law," *Lubin v. Kunin*, 17 P.3d 422, 426 (Nev. 2001), and "cannot be

defamatory because 'there is no such thing as a false idea.'" *Pegasus v. Reno Newspapers, Inc.*,

57 P.3d 82, 88 (Nev. 2002) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974)).

"[A] statement is not defamatory if it is an exaggeration or generalization that could be interpreted

by a reasonable person as 'mere rhetorical hyperbole.'" *Hussein v. Miller*, No. 03:06-CV-00710-

LRH-RAM, 2008 WL 11348299, at *2 (D. Nev. Feb. 26, 2008) (quoting *Pegasus*, 57 P.3d at 88).

Here, Plaintiffs' defamation claim was doomed from the very beginning as their

defamation claim relates exclusively to Mr. Carney's whistleblower complaint to the CFTC and

his Facebook post concerning the CFTC's investigation of IML. (*See* ECF No. 2 at ¶ 22; ECF No.

19 at ¶ 13). By example, Plaintiffs' alleged that Mr. Carney "filed a false Complaint with the

Commodities Future Trading Commission on or about the beginning of January 2018." (*See* ECF

No. 2 at ¶ 22; ECF No. 19 at ¶ 13). Plaintiffs further alleged that on or about January 19, 2018,

Mr. Carney posted on his own Facebook page: "IML Federal Investigation in FULL SWING!

That's all I cansay [sic]." (ECF No. 2 at ¶ 23; ECF No. 19 at ¶ 14). IML knew these statements to

be true, and none of these alleged actions by Mr. Carney constitute defamation because IML was under federal investigation and the CFTC *had* determined that IML had violated the Commodity Exchange Act and CFTC Regulations. (*See* Ex. A). Accordingly, Plaintiffs failed to satisfy the first element of their defamation claim.

Additionally, Plaintiffs' defamation claim was baseless because Plaintiffs: (a) failed to state what part of Mr. Carney's alleged false statements were both "false" and "defamatory," (b) failed to allege that Mr. Carney's alleged statements were an "unprivileged publication," and (c) failed to state which of Mr. Carney's statements to the CFTC were allegedly false and defamatory. Moreover, Plaintiffs' defamation claim was also baseless because filings with the CFTC are confidential. Thus, none of Mr. Carney's statements could have been a "publication" or qualified as defamation under Nevada law. Each of these pleading failures was an independent why Plaintiffs' defamation claim was baselesss, but even if Plaintiffs had properly plead their defamation claim, their claim would have failed, as "[s]tatements of opinion cannot be defamatory . . . ." *See Pegasus*, 57 P.3d at 88.

Finally, Plaintiffs' Complaint alleged that Scott Carney's statements were "derogatory" (ECF No. 22 at ¶ 12), and "implying" something (*id.* ¶ 11), but even if such labels were true, such statements are not actionable. The ability to express an opinion and to critique is protected by the First Amendment, and Mr. Carney's "expression[s] of opinion" are accordingly protected free speech. *See Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124, 1136 (W.D. Wash. 2007). Nor are Mr. Carney's opinions "sufficiently factual to imply a false factual assertion," therefore preventing Plaintiffs' defamation claim from being actionable. *Gardner v. Martino*, 563 F.3d 981, 989 (9th Cir. 2009). Thus, such statements are protected first amendment opinions, and not actionable statements. *See*, *e.g.*, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749,

777 (1985) ("[T]he First Amendment requires significant protection from defamation law's chill for a range of expression far broader than simply speech about pure political issues."); *Cochran v. NYP Holdings, Inc.*, 210 F.3d 1036, 1038 (9th Cir. 2000) ("[A] statement of opinion is . . . entitled to First Amendment protection" unless "it 'impl[ies] a false assertion of fact.'" (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990))). Accordingly, Plaintiffs' defamation claim was brought in bad faith and without reasonable ground as it had no basis in fact or law.

>           **b.**     **Plaintiffs' Trade Libel Claim Was Without Reasonable Grounds.**

Plaintiffs' trade libel claim was brought in bad faith and without reasonable grounds. Trade libel requires "that the defendant: (1) made a statement that disparages the quality of the plaintiff's product; (2) that the offending statement was couched as fact, not opinion; (3) that the statement was false; (4) that the statement was made with malice; and (5) that the statement resulted in monetary loss." *Shuffle Master, Inc. v. Awada*, No. 2:05-CV-1112-RCJ (RJJ), 2006 U.S. Dist. LEXIS 71748, at *17 (D. Nev. Sept. 26, 2006) (citations omitted).

Here, Plaintiffs' Complaint failed to allege that any of Mr. Carney's purported statements were "couched as fact, not opinion." *Id*. Second, Plaintiffs never alleged (a) what was "false" about Mr. Carney's purported statements, nor (b) that Mr. Carney "knew" any of his statements were false. Rather IML *was* under federal investigation. Accordingly, all of these pleading failures serve as a separate basis for why Plaintiffs' trade libel claim was baseless. Even if Plaintiffs had pled a proper claim for trade libel, Mr. Carney's alleged statements were at most opinion, and are therefore unable to be classified as "false." Accordingly, Plaintiffs' trade libel claim was brought without reasonable ground as it had no basis in fact or law.

### c.      Plaintiffs' Tortious Interference With Contractual Relations Claim Was Baseless.

Plaintiffs' tortious interference with contractual relations claim was baseless as it also was premised on Mr. Carney's true statements. Under Nevada law, tortious interference with contractual relations requires: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) damages." *Silver State Broad., LLC v. Beasley FM Acquisition Corp.*, No. 2:11–cv–01789–MMD–CWH, 2012 WL 4049481, at *6 (D. Nev. Sept. 12, 2012) (quoting *Consol. Generator-Nev., Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1255 (Nev. 1998)). Plaintiffs' Complaint failed to allege (a) what "valid and existing contract" they allegedly had, (b) that Scott Carney knew about it, or (c) that any contracts were "actual[ly] disrupt[ed]." *See id*. Accordingly, Plaintiffs' tortious interference with contractual relations claim was brought without reasonable ground as it had no basis in fact or law.

### d.      Plaintiffs' Tortious Interference With Prospective Economic Advantage Claim Was Baseless.

Plaintiffs' tortious interference with prospective economic advantage claim was baseless. Under Nevada law, tortious interference with prospective economic advantage requires: "1) a prospective contractual relationship between the plaintiff and a third party; 2) the defendant's knowledge of this prospective relationship; 3) the intent to harm the plaintiff by preventing the relationship; 4) the absence of privilege or justification by the defendant; and, 5) actual harm to the plaintiff as a result of the defendant's conduct." *Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1225 (Nev. 1987) (cited with approval in *Jiangmen Kinwai Furniture Decoration Co. v. Int'l Mkt. Ctrs., Inc.*, 719 F. App'x 556, 559 (9th Cir. 2017)).

12

Plaintiffs' Complaint failed to even (a) allege or attach what "prospective contractual relationship" Plaintiffs allegedly had, (b) identify any "third party" they had a "prospective contractual relationship" with, (c) assert that Mr. Carney knew about the "prospective relationship," or (d) state that he had an "intent" to harm a particular prospective relationship. *See id.* Accordingly, Plaintiffs' tortious interference with prospective economic advantage claim was brought in bad faith as it had no basis in fact or law.

**B.     The Attorneys' Fees Sought By Mr. Carney Are Reasonable.**

Federal courts apply state law with regard to the allowance or disallowance of attorney fees related to state law claims. *Michael-Regan Co. v. Lindell*, 527 F.2d 653, 656 (9th Cir. 1975). Because this action was filed in Nevada, Nevada law applies with regard to the allowance of attorneys' fees.

The preferred method employed by Nevada courts to determine a reasonable attorney fee is the "lodestar" method. *Shuette v. Beazer Homes Holdings Corp*, 124 P.2d 530, 549 (Nev. 2005); *see also Branch Banking & Tr. Co. v. Regena Homes, LLC, No. 2:12-cv-00451-APG-GWF, 2016 WL 4644477, at *1 (D. Nev. Sept 6, 2016).* Under that approach, the court "must multiply the number of hours reasonably spent on the case by a reasonable hourly rate to reach what is termed the lodestar amount." *Herbst v. Humana Health Ins. of Nev., Inc.*, 781 P.2d 762, 764 (Nev. 1989). "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010) (internal quotation marks omitted).

Rate determinations in other cases filed in the District of Nevada have found prevailing market hourly rates in this forum to be as much as $425-$475 for partners and $325 for an experienced associate. *See Plaza Bank v. Alan Green Family Trust*, 2013 WL 1759580 (D. Nev.

April 24, 2013) (D. Nev. April 24, 2013) (finding $425–$475 for partner time and $250-$325 for associate time reasonable). The actual fee agreement itself does not necessarily cap the lodestar amount. *See id.* ("[T]he actual fee agreement does not act as a cap on the amount of statutory fees awarded."); *Corder v. Gates*, 947 F.2d 374, 378 n.3 (9th Cir. 1991) ("[I]t is clear that an award of a 'reasonable' attorney's fee may be made to a prevailing plaintiff notwithstanding the fact that the plaintiff's attorney agreed to accept a smaller fee or even no fee at all."); *Nadarajah v. Holder*, 569 F.3d 906, 916 (9th Cir. 2009).

Once a court determines the lodestar, it may adjust it upward or downward based on evaluating the factors set forth in Local Rule 54-14(b)(3). *Liguori v. Hansen*, No. 2:11-cv-00492-GWF, 2017 WL 627219, at *11 (D. Nev. Feb. 15, 2017).

## 1. Defendant Scott Carney's Counsel's Hours and Rates are Reasonable and in Line with Comparable, Prevailing Rates.

Application of pertinent case authority and factors[1] set forth in Local Rule 54-14 establish the reasonableness of the requested attorneys' fees in this matter.

### a. A Reasonable Itemization and Description of the Work Performed and Summary of the Time and Labor Required.

The evidence needed to satisfy the lodestar inquiry, as well as the requirements of Local Rule 54-14, is found in the declarations of Mr. Carney's counsel of record, Daniel McNutt (attached as "Exhibit B") and Adam Wolek (attached as "Exhibit C"). The McNutt and Wolek declarations include chronological billing entries (the "Billing Entries") that describe in detail the particular tasks performed, the date on which they were performed and the time devoted to the tasks. Courts have held that computer-generated chronological lists of tasks performed and times

---

[1] The factors enumerated in Local Rule 54-14(b)(3)(J) are inapplicable to this case and therefore have no bearing on this matter. Additionally, the Court has not presently requested any other information, so Local Rule 54-14(b)(3)(M) is inapplicable at this time.

devoted to those tasks are sufficient to provide "adequate and specific descriptions of services" of the purpose of determining a reasonable fee. *Washington v. Philadelphia Court of Common Pleas*, 89 F.3d 1031, 1038 (3rd Cir. 1996) (citation omitted).

In determining the amount of time that is reasonable to spend on tasks, "[b]y and large, the [district] court should defer to the winning lawyer's professional judgment as to how much time he [or she] was required to spend on the case." *Moreno v. City of Sacramento,* 534 F.3d 1106, 1112 (9th Cir. 2008). Here, the reasonableness of the time recorded in the Billing Entries is confirmed by both McNutt and Wolek. McNutt, admitted to the bar in 2001, is a prominent Las Vegas, Nevada attorney with a substantial commercial litigation practice. (Exhibit B, McNutt Dec. ¶ 6). McNutt has litigated hundreds of cases in his career, including in this district, and is aware of the amount of time required to perform the tasks described on the Billing Entries. (*Id*. at ¶ 10).

Wolek is a prominent litigation attorney with a nationwide practice in intellectual property and commercial litigation. (Exhibit C, Wolek Dec. ¶ 6). Wolek has litigated numerous cases nationwide, including cases involving defamation and tortious interference claims, and is aware of the amount of time required to perform the tasks described on the Billing Entries. (*Id*.) Both McNutt and Wolek have opined that the time spent defending Plaintiffs' lawsuit was reasonable. (Exhibit B, McNutt Dec. ¶ 21; Exhibit C, Wolek Dec. ¶ 25).

The time set forth in the statements is also reasonable on its face. Despite the frivolity of this action, defense of this case required considerable effort, research, and skill. Plaintiffs' initial complaint asserted five separate state law claims against Defendant Carney, which forced Mr. Carney's attorneys to perform a significant amount of research and analysis regarding each of Plaintiffs' claims. Additionally, because of Plaintiffs's selection of forum, Mr. Carney's attorneys were required to consider questions involving personal jurisdiction, venue, and choice of law.

Thus, the amount of time, labor, and attention Mr. Carney's attorneys afforded to Plaintiffs' baseless lawsuit was reasonable in light of the legal analysis performed, depth of research required, and sheer number of filings related to Plaintiffs' lawsuit, which includes Plaintiffs' initial and first amended complaints, Mr. Carney's motion to dismiss Plaintiffs' initial and first amended complaints, Mr. Carney's reply brief to Plaintiffs' opposition memorandum, Mr. Carney's motion to stay discovery, Mr. Carney's motion for entry of final judgment, and Carney's motion for attorneys' fees and costs.

        **b.**       **The Results Obtained and the Amount Involved.**

As demonstrated by the Court's Order (ECF No. 30), Mr. Carney obtained dismissal on all of Plaintiffs' claims. A review of the Court's docket reveals that all work performed by counsel for Mr. Carney was directly related to the furthering of the litigation or in response to Plaintiffs' pleadings.

        **c.**       **The Experience, Reputation, and Ability of the Attorneys, and Skills Requisite to Perform the Legal Services Properly.**

The declarations of Wolek and McNutt provide this court with additional and detailed information regarding the experience, reputation, and ability of Mr. Carney's attorneys and the reasonableness of their fees. Nevertheless, Defendant Carney was represented by Taft, Stettinius, & Hollister, LLP ("Taft") and the McNutt Law Firm ("MLF"). Taft is a Midwest law firm with more than 400 lawyers in 8 offices. Taft served as lead counsel in this case. MLF is a Las Vegas law firm with two lawyers. MLF served as local counsel in this case.

The work actually performed by Mr. Carney's counsel required specialized skills to perform Mr. Carney's legal services properly. As explained above, Mr. Carney's counsel were required to conduct extensive research and analysis. Additionally, due to Plaintiffs' filing multiple complaints, Mr. Carney's counsel was forced to brief several, dispositive motions, which

ultimately resulted in a successful outcome. Mr. Carney's counsel therefore required specialized and sophisticated skills to properly perform the legal services rendered in this action.

### d.    The Customary Fee and Awards in Similar Cases.

When determining a reasonable hourly rate, the relevant community to consider is the forum in which the district court sits, here, Nevada. *Prison Legal News*, 608 F.3d at 454. "Affidavits of the…[petitioning] attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the [petitioning] attorney, are satisfactory evidence of the prevailing market rate." *Beauchamp v. Anaheim Union High Sch. Dist.*, 816 F.3d 1216, 1224 (9th Cir. 2016) (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990)). Courts in the District of Nevada have found reasonable rates in this market to be as much as $475 for partners and $325 for an experienced associate. *See Plaza Bank v. Alan Green Family Trust*, 2013 WL 1759580 (D. Nev. April 24, 2013) (D. Nev. April 24, 2013). In addition, courts in this district have found reasonable hourly rates of $75 to $125 for law clerks and paralegals. *See Crusher Designs, LLC v. Atlas Copco Powercrusher GmbH*, 2015 WL 6163443, *2 (D. Nev. Oct. 20, 2015).

Here, the requested attorneys' fees are based on fixed, hourly rates. As discussed *supra*, McNutt is a long-standing Las Vegas, Nevada attorney with a prominent litigation practice. (Exhibit B, McNutt Dec. ¶ 6). McNutt has significant experience with the standard market rates in Nevada and has litigated fee petitions in the past. (*Id*. at ¶ 10). Here, the McNutt Declaration establishes that prevailing rates for similar litigation in Nevada are $475 from partners and $325 for associates. (*Id*. at ¶ 11) Further, the McNutt Declaration establishes rate determinations of his own rate from previous litigation in Nevada in the amount of $475 for partners and $325 for associates. (*Id*. at ¶¶ 11-12) The rates charged by MLF in this case, $475 for partners, $325 for

17

associates, and $150 for paralegals, are consistent with rates customarily charged in the Las Vegas, Nevada market by attorneys at law firms of similar size and/or reputation for similar legal services and experience levels. (*Id*.)

Pursuant to case law, Mr. Carney seeks recovery of Taft's attorneys' fees at the Nevada market rate of $450 for partners, $325 for associates[2], $150 for paralegals, and $75 for law clerks. Taft served as lead litigation counsel in this case. Taft's attorneys have had an ongoing attorney-client relationship with Scott Carney since 2015.  This long-standing relationship justified Taft charging a discounted rate for this matter. The primary Taft billers on this case were partners Adam Wolek, associate Zachary Clark, and associate Rashad Simmons. The hourly rate of Mr. Wolek was discounted to $450 as the billing rates for a partner at Taft generally range between $390-$615 per hour. Zachary Clark's hourly rate is low compared to the hourly rates charged to other clients as Taft generally charges $300-$350 for an associate. Rashad Simmons' hourly rate is $365 as he is an experienced associate. Taft also used numerous law clerks on this matter to conduct legal research, which could have been completed at a higher hourly rate by a Taft associate attorney. However, law clerks were assigned numerous research tasks to keep litigation costs low. Accordingly, the rates charged by Taft in this matter were fair and reasonable.

### e.      The Novelty and Difficulty of the Questions Involved.

The novelty and difficulty of the questions involved increased the costs of defending this action. As discussed *supra*, Plaintiffs' initial complaint asserted five separate state law claims against Defendant Carney, which forced Mr. Carney's attorneys to perform a significant amount of research and analysis regarding each of Plaintiffs' claims. Additionally, because Plaintiffs filed this lawsuit in this foreign and unrelated forum, Mr. Carney's attorneys were required to consider

---

[2] The hourly rate for Taft associates on this case ranged from $250 to $365 an hour. Accordingly, Defendant seeks recovery of Taft's attorneys' fees at a "blended" rate of $325.

questions involving personal jurisdiction, venue, and choice of law. Accordingly, this was not a routine case and the questions involved in this matter were difficult.

### f.    The Time Limitations Imposed By the Client or the Circumstances.

The fees and costs of this litigation were increased as a result of Plaintiffs' counsel's actions. By example, Plaintiffs served Scott Carney on or near March 20, 2018. (ECF No. 10). On April 11, 2018, this Court granted Mr. Carney until May 10, 2018 to file his answer or otherwise plead in response to Plaintiffs' initial complaint. (ECF No. 13). Mr. Carney's counsel asked Plaintiffs' counsel for a thirty-day extension to answer or otherwise plead due to Mr. Carney's counsel's unforeseen health issues. However, Plaintiffs' counsel refused Defendant's request. (*See* May 9, 2018 email, attached hereto as "Exhibit D"). Accordingly, Mr. Carney's counsel was required to act quickly in developing a litigation strategy, researching Plaintiffs' numerous claims, and gathering evidence needed to support Mr. Carney's initial motion to dismiss. These time constraints increased the attorneys' fees and costs as counsel was forced to expedite research and briefing and involve additional attorneys as necessary to timely complete the work.

In addition to the above, Plaintiffs' counsel increased the fees and costs of this litigation when they inexcusably rejected Defense Counsel's offer to stay discovery pending the outcome of Mr. Carney's motion to dismiss. (*See* June 11, 2018 email, attached hereto as "Exhibit E"). Accordingly, Mr. Carney's attorneys were forced to prepare yet another motion. Notably, Mr. Carney's motion to stay discovery *and* motion to dismiss were both granted by the Court. Thus, Defendant Mr. Carney should be awarded his attorneys' fees as a result of Plaintiffs' refusal to avoid motion practice and insistence on wasting the parties' time and Court's resources.

      g.      **Preclusion of Other Employment by the Attorney Due to Acceptance of the Case and the Undesirability of the case.**

Both Mr. Wolek and Mr. McNutt could and would have otherwise worked on other matters but for this matter, but otherwise the remaining aspects of this factor were minimally present in this case.

      h.      **The Nature and Length of the Professional Relationship with the Client.**

As set forth *supra* in Wolek's Declaration, Taft's attorneys have represented Mr. Carney in numerous legal matters across the country since 2015. Accordingly, Taft offers a unique and unmatched understanding and insight to Mr. Carney's position in and knowledge of the financial industry.

## V.    CONCLUSION

Plaintiffs knowingly brought and maintained this action without reasonable grounds. Their conduct was frivolous, vexatious, and has needlessly cost Defendant Scott Carney tens of thousands of dollars. This Court should therefore exercise its inherent power and statutory authority under NRS 18.010 by awarding Scott Carney his attorneys' fees and costs incurred in defending this frivolous and harassing lawsuit in the amount of $61,336.13.

Dated:  April 8, 2019               Respectfully submitted,

                                      SCOTT CARNEY,

                                      By: s/   Adam Wolek
                                      Adam Wolek
                                      awolek@taftlaw.com
                                      TAFT STETTINIUS & HOLLISTER LLP
                                      111 E. Wacker Drive, 28th Floor
                                      Chicago, Illinois  60601
                                      Phone: (312) 836-4063
                                      Fax: (312) 966-8598

                                      DANIEL R. MCNUTT (SBN 7815)

MATTHEW C. WOLF (SBN 10801)
MCNUTT LAW FIRM, P.C.
625 South Eighth Street
Las Vegas, Nevada 89101

*Attorneys for Defendant Scott Carney*

21

**CERTIFICATE OF MAILING**

I HEREBY CERTIFY that pursuant to F.R.C.P. 5 on April 8, 2019, I caused service of the foregoing via the United States District Court's CM/ECF system.

*/s/ Adam Wolek*
Adam Wolek